# IN THE COURT OF APPEALS OF IOWA

No. 17-1773
Filed April 14, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DEVIN MARQUES CARTER,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.


Devin Marques Carter challenges his convictions for first-degree murder, two counts of attempted murder, and intimidation with a dangerous weapon. **AFFIRMED.**


Karmen Anderson of Anderson & Taylor, P.L.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.


Considered by Vaitheswaran, P.J., and Mullins and Ahlers, JJ.

**AHLERS, Judge.**

What started as an argument in a bar over a pitcher of beer turned into an altercation in the bar's parking lot that ended with a barrage of gunfire that left one person dead and two seriously injured. A jury determined Devin Marques Carter was the shooter, resulting in Carter's convictions for first-degree murder, two counts of attempted murder, and intimidation with a dangerous weapon. He challenges the sufficiency of the evidence supporting his convictions, argues the district court erred in denying his motion for a new trial, and raises claims of ineffective assistance of counsel.

## I.     Factual Background

We begin by highlighting key facts that were largely uncontested at trial. These facts are gleaned from testimony as well as surveillance video of events transpiring inside and outside the bar.

On Friday, August 5, 2016,[1] members of a family and their significant others decided to go out for a night on the town. They eventually ended up at the same bar on the east side of Des Moines. The group generally consisted of six people: Bill; Bill's son (known as "Bub"); Ashley (Bill's daughter and Bub's sister); Carley (Bub's girlfriend); Bonnie (Bub's second cousin); and Dylan (Bonnie's boyfriend).[2] We will refer to this group as "the family group."

During the course of the evening, Dylan, who was too young to purchase alcohol, gave Bill's girlfriend money to buy a pitcher of beer for him. After a short

---

[1] Although the family's evening started on August 5, the events forming the basis for this case took place after midnight, in the early morning hours of August 6.
[2] Although Dylan was not related to the family, he had been dating Bonnie for a considerable time, was "close" to the family, and viewed Bill as a father figure.

period of time passed, Dylan became convinced Bill's girlfriend had pocketed the money without buying the beer. Dylan angrily confronted Bill. Bill was offended by Dylan's accusations and headed outside toward the bar's parking lot. It is not clear whether Bill left the bar to get away from the confrontation or to continue the confrontation outside. Either way, Dylan went with him, and the two proceeded toward the back of the parking lot across the street from the bar. The other four in the family group became aware of the dispute and followed not far behind Bill and Dylan. All six can be seen on surveillance video proceeding to the back of the parking lot.[3]

Once in the back of the parking lot, there are differing accounts of exactly what happened, but the evidence was generally consistent that Dylan was acting like he wanted to fight Bill, Bill was willing to fight but was warning Dylan not to do so,[4] and the others were trying to diffuse the situation. Dylan, feeling outnumbered, headed back toward the bar to look for help.

Dylan saw his cousin, Steven,[5] standing outside the bar in the smoking area along with Carter. Dylan asked Steven to go with him to the parking lot because

---

[3] We reference the "back of the parking lot" as the portion of the parking lot past the last in the line of parked vehicles farthest away from the bar. Once individuals get to the back of the parking lot, being able to differentiate them on the video is not always possible due to sight lines between the camera and the individuals being blocked by parked vehicles, distance from the camera, darkness, and camera resolution, but movement of individuals' heads showing above the last of the vehicles is sometimes discernible.

[4] The evidence established Dylan tended to become belligerent and aggressive when drinking. So even though he looked up to Bill as a father figure, Dylan showed an inclination to fight him that night. At the time, Dylan was eighteen years old and Bill was forty.

[5] Steven also goes by the nickname "Pookie."

he was in an argument and wanted help.[6]  Steven agreed and began to walk toward the back of the parking lot with Dylan.  Although he had not been asked to go, Carter went with the other two.  Carter testified that he followed because "I only knew one set of three black guys that was there, and that was my cousin and his friends" and "I just wanted to make sure that ain't who he was talking about."

As the trio reached the back of the parking lot where the five other members of the family group remained, Dylan heard someone say, "You know I've got your back, Pookie."  Dylan did not see who made the statement and was not even aware that Carter had come with them, but surveillance video shows the only other person with them was Carter.

It is clear from the video that when the trio of Dylan, Steven, and Carter rounded the corner behind the last row of vehicles in the parking lot, at least some of the family group and some of the trio converged in a rapid manner, suggesting they were running toward each other as part of the confrontation.  There is conflicting evidence as to exactly what happened next in terms of who made physical contact with whom, but there was general consensus there was some physical and verbal confrontation between members of the family group and both Dylan and Steven.  Very shortly after the altercation began, a single gunshot was fired in the back of the parking lot, followed by a pause, and then a barrage of additional gun shots.

---

[6] There is conflicting evidence of what Dylan said.  According to Dylan, he said, "There's two guys out in the parking lot trying to jump me." Steven testified, "Dylan[] walks up to me and says that he was about to get jumped by a couple black guys, so he asked me to walk him across the street."  Carter testified Dylan said "three black guys was trying to jump him."

Twelve spent nine-millimeter shell casings were later found on the ground in the back of the parking lot at the location of the shooting, all determined to have been fired from the same gun. The shooting resulted in Bill dying from a gunshot wound to the head, Carley being critically wounded from a gunshot wound to her leg, and Bub being seriously injured from two gunshot wounds to his back, one to his leg, and one to his foot.

After an investigation, law enforcement and prosecutors concluded Carter had been the shooter. Carter was charged with murder in the first degree, two counts of attempted murder, and intimidation with a dangerous weapon.[7] After a jury trial, Carter was found guilty of all four charges and sentenced accordingly. He appeals, raising the issues previously noted.

## II.    Sufficiency of the Evidence

Carter challenges the sufficiency of the evidence on all counts based on one claim only—the State failed to prove he was the shooter. Claims of insufficient evidence are reviewed for correction of legal error. *State v. Schiebout*, 944 N.W.2d 666, 670 (Iowa 2020). "We will uphold the verdict on a sufficiency-of-evidence claim if substantial evidence supports it." *Id.* "Evidence is substantial 'if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019)). All evidence is considered, not just the evidence supporting the verdict. *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017).

---

[7] Carter was also charged with possession of a firearm as a convicted felon. That charge was severed from the other counts for purposes of trial. After completion of the trial on the other four counts, the charge of possession of a firearm as a convicted felon was dismissed on speedy trial grounds.

## A.    The Potential Shooters

Before beginning the discussion of the direct and circumstantial evidence supporting the jury's finding Carter was the shooter, we find it worthwhile to distill some of the facts detailed previously in order to provide the proper framework for analyzing the sufficiency of the evidence against Carter.  In particular, it is important to note who was present at the location of the shooting.

The evidence established there were eight people and eight people only in the back of the parking lot where the shooting took place at the time of the shooting.  Those eight people were: Bill, Bub, Carley, Ashley, Bonnie, Dylan, Steven, and Carter.  This is important because it narrows the list of potential people who could have been the shooter.  There is no evidence that would support a conclusion that anyone other than those eight people were in the back of the parking lot when the shots were fired.[8]  Therefore, the evidence suggests one of those eight had to be the shooter.

The three people who were shot are presumably above suspicion.  Further, there is no evidence and no suggestion that Ashley or Bonnie was the shooter.  That narrows it down to one of the trio (i.e., Dylan, Steven, or Carter) being the shooter.  That list can be further narrowed because there is no evidence suggesting Steven was the shooter.  That leaves Dylan and Carter.  Of course, the State points at Carter, and Carter points at Dylan.  With that distillation of the facts, we now turn to the evidence supporting the jury's finding Carter was the shooter.

---

[8] Fencing along the back perimeter of the parking lot farthest from the bar eliminates any reasonable likelihood that an unknown person materialized in the back of the parking lot, fired the shots, and then left without anyone noticing.  Carter does not make a claim of any such mystery person.

## B. Direct Evidence

The sufficiency-of-the-evidence analysis begins with the fact there were eyewitnesses who identified Carter as the shooter. Some of the evidence from these eyewitnesses came directly from their trial testimony, and some of it came from the witnesses' statements to others. We will begin with the evidence that came from trial testimony.

### 1. Eyewitnesses – Trial Testimony

One eyewitness to the shooting was Steven.[9] Steven testified that when he first heard a gunshot, he looked in the direction of the shot and saw Carter with a gun in his hand, "swirling" it in the air. He further testified he did not have a gun and he saw no one other than Carter with a gun.

Efforts to impeach Steven with a prior inconsistent statement revealed Steven had given deposition testimony in April 2017 in which he denied seeing who did the shooting. After these impeachment efforts, Steven was rehabilitated[10] by two prior statements he made that were consistent with his trial testimony identifying Carter as the shooter. The first was a detailed statement he gave to police on the day of the shooting in which he clearly identified Carter as the shooter. The second was the testimony he gave in a second deposition in August

---

[9] Although it is not entirely clear whether it would be accurate to describe Steven and Carter as friends, surveillance video from inside the bar before the shooting shows they were on friendly enough terms to spend considerable time hanging out together at the bar. Their time together included Carter buying drinks for Steven in celebration of Steven's birthday.

[10] *See* Iowa Rule of Evidence 5.801(d)(1)(B) (defining as "not hearsay" prior statements consistent with the declarant's testimony when offered to rebut an express or implied charge that the declarant recently fabricated the declarant's trial testimony).

2017, in which he again identified Carter as the shooter. In other words, Steven told his version of events four times, and in three of them, including the one given a few hours after the shooting and during his trial testimony, Steven clearly identified Carter as the shooter. Steven explained that he did not identify Carter as the shooter in his first deposition because that was the first time he had seen Carter since the shooting and he was afraid of Carter.

The parties can, did, and continue to debate the strength of Steven's testimony and how much weight it should be given after consideration of the inconsistent statement from his first deposition. They also can, did, and continue to debate what role Steven's intoxication level played in terms of the weight to be given his testimony.[11] These questions were vigorously debated before the jury, as well they should have been. However, on a sufficiency-of-the-evidence review such as this, our role is not to assess the credibility of witnesses or resolve conflicts in the evidence, as that role is reserved for the jury. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (noting that when assessing the sufficiency of the evidence "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury" (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005))). Steven's testimony alone provides sufficient evidence to support the jury's conclusion Carter was the shooter. But there's more.

---

[11] The evidence was fairly uncontested that all eight people in the back of the parking lot at the time of the shooting were intoxicated to some degree or another.

Bub also testified at trial. He testified that, after being shot, he looked around and saw an "African-American" "male" wearing "[a] white t-shirt" firing a gun in the direction of his father. Because Carter was the only African-American male in the back of the parking lot at that time and was wearing a white t-shirt, the jury could conclude Bub was describing Carter.

Bub's testimony was significantly impeached, even more so than Steven's. Besides acknowledging he was intoxicated at the time of the shooting, Bub had given a statement to the police a few days after the shooting in which he denied seeing who the shooter was. Bub attempted to explain these inconsistencies by asserting he was heavily medicated in the hospital at the time he gave his statement. However, the evidence also established Bub was unable to identify Carter as the shooter during his deposition or from Carter's photo on a newscast. While Bub's testimony was impeached in these ways, it was still up to the jury to decide how much, if any, weight to give Bub's testimony. *See id.*

### 2. Eyewitnesses – Excited Utterances

In addition to these eyewitness accounts, spontaneous statements made by two other eyewitnesses shortly after the shooting identified Carter as the shooter. These statements were admitted as substantive evidence pursuant to the excited-utterance exception to the hearsay rule. *See* Iowa R. Evid. 5.803(2); *State v. Tejeda*, 677 N.W.2d 744, 753 (Iowa 2004) ("The rationale behind the exception is that statements made under the stress of excitement are less likely to involve deception than if made upon reflection or deliberation.").

The first of these statements came from Bonnie, who was one of the eight people in the back of the parking lot at the time of the shooting. Shortly after the

gunshots stopped, Steven's sister[12] walked from the bar to the back of the parking lot to see what happened. After seeing three bodies on the ground, the sister called 911. She observed Bonnie in a very emotional state, which the sister described as "freaking out." Bonnie was yelling that "the black guy in the white shirt with the Afro"[13] was the person that "did it," referring to the shooting. Bonnie further stated the shooter had been with Steven. Given the uncontroverted evidence that the only two people with Steven were Dylan and Carter, this piece of information also identifies Carter as the shooter. Bonnie and the sister knew Dylan and Steven by sight and name but did not know Carter, so he would have been the only member of the trio that she would only be able to identify by description rather than name. By the time of trial, a little more than one year after the shooting, Bonnie testified she could not identify the shooter. Nevertheless, her excited utterance immediately following the shooting was admitted into evidence and was available to the jury in determining the identity of the shooter.[14]

In addition to Bonnie's statements, Dylan also made excited utterances to two people at different times. Dylan fled the scene shortly after the shooting. His aunt was at home engaging in one of her past times—listening to the police

---

[12] Steven's sister is also a cousin to Dylan.

[13] While most people may not describe Carter's hairstyle as an "Afro," it is uncontroverted he was wearing a white t-shirt.

[14] While Bonnie testified at trial she did not see the shooter, she affirmatively stated neither Dylan nor Steven was the shooter based on their positioning and where "the shots were." She also testified, while attending to Bill on the ground, she looked up and saw "an African-American male standing there, white t-shirt, jeans, stood there like he was kind of in shock." That man had his hand "at his hip" and looked like he was holding "what could have been a gun." Bonnie stated she looked down at Bill, and when she "looked back up, [the man] was gone."

scanner. She heard about a shooting at the bar in question, which caused her concern because she knew Dylan was there. After multiple phone calls, she was able to determine Dylan had not been shot and she made arrangements to have him picked up and dropped off at her house. When he arrived, Dylan was "very, very upset" and "bawling." While in that excited state, Dylan stated that Bub and Bill had been shot, describing them as "his best friend and his uncle." He also said the shooter was "a black guy." His aunt then took Dylan to the home of her brother (Dylan's uncle). Dylan was still bawling and "was a wreck" when they arrived. Dylan told his uncle the same thing he had told his aunt, which was that "a black guy" had been the shooter. Given that Carter was the only African-American person in the back of the parking lot at the time of the shooting, Dylan's statements provided additional evidence supporting the jury's verdict that Carter was the shooter.

### 3. Eyewitness – Prior Identification

A final piece of eyewitness evidence was introduced based on identification statements an eyewitness made to a law enforcement officer. A man by the name of Tytrace was at the bar in question and heard about the expected fight in the parking lot, which was the altercation brewing between Bill and Dylan. Tytrace intended to video record the fight on his phone and headed toward the back of the parking lot along with his sister to do so. As he and his sister approached the back of the parking lot, the shooting took place. Tytrace and his sister ducked for cover when the shooting started. After the shooting stopped, Tytrace paid attention to where Carter went and went out of his way to track Carter down and used a video app on his phone to capture Carter's image. A detective who arrived on the scene

immediately after the shooting began interviewing witnesses, including Tytrace.

The detective gave the following testimony about that interview:

> Q. [P]reviously you testified that you had an encounter with Tytrace []; is that correct?  A. Yes.
> Q. Was that on the morning of August 6th, 2016?  A. Yes.
> Q. During that encounter, did you review any video with Tytrace []?  A. Yes.
> Q. Where was that video from?  A. He showed me that video from his phone.
> Q. And upon reviewing that video with [Tytrace], did you look at a specific video clip?  A. Yes.
> Q. Okay.  What did he say?
> DEFENSE COUNSEL:  Objection, based on our prior record.
> COURT:  Overruled.  You may answer.[15]
> Q. What did he say?  A. He said that "I was trying—trying to get his face" while he was pointing to this person on the phone, and he said, "I just seen him shoot three people dead."
> Q. Did you look at that video along with [Tytrace]?  A. Yes.
> Q. Did you see the individual that he was pointing to?  A. Yes.
> Q. Do you see that individual in the courtroom today?  A. Yes.

The detective then identified Carter as the person Tytrace identified in the video.

Tytrace's identification of Carter as the person he just saw "shoot three people

---

[15] When Tytrace testified during trial, he denied recalling reviewing a video with the detective or making any statements identifying anyone on a video.  During a hearing prior to the testimony set forth here, Carter objected to this line of questioning, claiming it was an impermissible way of introducing hearsay evidence in violation of the standards articulated in *State v. Turecek*, 456 N.W.2d 219 (Iowa 1990).  In simplified terms, *Turecek* holds the State is not permitted "to place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible."  456 N.W.2d at 225.  The State argued this was not a *Turecek* issue because the detective's testimony was not offered for impeachment; instead, the evidence was independently admissible as substantive evidence of the prior identification.  *See* Iowa R. Evid. 5.801(d)(1)(C) (defining statements identifying a person as someone the declarant perceived earlier as "not hearsay").  The State relied on *State v. Russell*, 893 N.W.2d 307 (Iowa 2018), in support of this distinction.  The district court agreed and the testimony was admitted as substantive, non-hearsay evidence, not as impeachment.  No challenge to this evidentiary ruling is asserted on appeal.

dead" was additional evidence upon which the jury could rely in reaching its verdict determining Carter to be the shooter.

### C.     Circumstantial Evidence

In addition to the direct evidence, there are also several pieces of circumstantial evidence the jury could have used to support its determination Carter was the shooter.  *See State v. Ernst*, 954 N.W.2d 50, 57 (Iowa 2021) (reiterating that direct and circumstantial evidence are equally probative); *see also* Iowa R. App. P. 6.904(3)(p).

### 1.     Motive

To begin, there is some evidence of potential motive.  As the trio rounded the corner into the back of the parking lot anticipating a confrontation, there was evidence Carter told Steven words to the effect, "You know I've got your back, Pookie."  While Carter denied making this statement, it is was up to the jury to determine what testimony to believe.  *See Musser*, 721 N.W.2d at 761 (noting resolution of conflicts in the evidence is for the jury).  If the jury chose to believe Carter made this statement, while not overwhelming, it was some evidence of motive for the shooting, as the shooting started almost immediately after Steven became involved in a physical altercation, suggesting Carter may have opened fire as his way of "having Steven's back."  While the State was not required to prove motive for the shooting, doing so strengthened its case against Carter.  *See State v. Richards*, 809 N.W.2d 80, 84 (Iowa 2012) ("[A]lthough the murderer's intent was not seriously contested, the identity of the murderer was, so it behooved the State to establish that [the defendant] had a motive for murdering [the victim].").

### 2. Carter's Deception

Then, there are the lies Carter told to his mother, law enforcement, and the jury, any of which the jury could have used as evidence of Carter's guilt. *See Ernst*, 954 N.W.2d at 56 ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt and . . . is relevant to show that the defendant fabricated evidence to aid his defense." (alteration in original) (quoting *State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993))).

Records from Carter's cell phone show a series of text messages between Carter and his mother shortly after the shooting as follows:

MOTHER: R u still outside
CARTER: Yes why[?]
MOTHER: Bcuz I heard there was a shooting at [the bar in question]
CARTER: I jus seen that on facebook but im still outside

Even to his own mother, Carter engaged in deception by suggesting he found out about the shooting through social media rather than acknowledging that he was in the immediate vicinity of and was a witness to the shooting when it happened. Of course, one could think of a number of reasons why Carter lied to his mother, but one of those reasons could be that Carter was trying to avoid creating witnesses against him by lying to his mother about his knowledge of and whereabouts at the time of the shooting. The jury was permitted to infer from Carter's deception to his mother evidence of his guilt.

In addition to being deceptive with his mother, Carter also lied to police during an interview the afternoon following the shooting. Carter repeatedly told the investigating officer he was not in the parking lot when the shooting occurred, as he was on the "smoke deck" at the bar. This story was conclusively rebutted by

video evidence and Carter's own testimony. The jury could have easily concluded Carter lied about his location because he was the shooter and thought his best defense was to claim he was nowhere near the shooting.

In addition to lying about his whereabouts, Carter also lied to the investigating officer about the clothes he was wearing at the time of the shooting. When he showed up for the interview, Carter was wearing jeans and a black t-shirt. In contrast, video evidence from the time of the shooting showed him wearing shorts and a white t-shirt. In spite of the fact he was clearly wearing different clothes, Carter told the officer the jeans he was wearing at the time of the interview were the same jeans he was wearing at the time of the shooting. If the false information as to what he was wearing at the time of the shooting was believed, Carter could have created confusion as to whether he was the person identified as the shooter at the scene. Also, by lying to the police about what clothes he was wearing, Carter could counteract any potential forensic evidence by having the police test the wrong clothes or stop looking for the actual clothes. The jury could have interpreted this evidence as Carter's effort to misdirect the investigation or confuse the fact finder as to his identity at the scene.

To put these false stories in perspective, we will revisit Carter's trial testimony. According to Carter, he tagged along with Dylan and Steven to see if Steven's cousin and the cousin's friends were going to be involved in the anticipated altercation in the back of the parking lot and, the next thing he knew, some unknown shooter opened fire on the crowd. If Carter's version of events was true, then Carter was not engaged in any criminal behavior and was himself a victim of the shooting in the sense he was a member of the crowd into which the

shooter opened fire. But why would a person who engaged in no criminal behavior and who was himself a victim of a crime go to such great lengths to distance himself from the scene of the crime and attempt to steer investigators away from the clothes he was wearing at the time? The jury was free to conclude the reason Carter engaged in such fabrications was because he was the shooter.

And Carter's fabrications did not end with his statements to his mother and the police. Carter testified at trial that, when he heard the gun shots, he immediately ducked and then ran away from the shooting scene toward his vehicle in another area of the parking lot. He testified he did not stick around the shooting scene long enough to see if anyone had been shot. However, video evidence directly rebuts this claim. Even though the video of the parking lot contains no sound, a fairly clear determination of when the shooting started and stopped can be made. A flash coupled with a puff of smoke can be seen in the back of the parking lot just moments before other patrons in the front of the parking lot heading toward the back of the parking lot can be seen ducking, scattering, and running for cover. This suggests the flash and puff of smoke marks when the shots began. A few seconds later, people can be seen coming out of their protective crouches, standing up, and coming out of their areas of cover, suggesting the shooting had stopped. When the shooting stopped, Carter was still in the back of the parking lot and shortly thereafter jogged quickly away from the back of the parking lot past the location where the bodies of the victims would have been lying. This video evidence directly rebuts Carter's testimony that he immediately ducked and ran from the scene without waiting to see if anyone was hit. The jury was free to use this fabrication as evidence of Carter's guilt as well.

### 3. Carter's Failure to Flee When Gunfire Started

Carter's actions in the back of the parking lot during and after the shooting is also circumstantial evidence that he was the shooter beyond the implications of his fabrications. As previously noted, there were eight people in the back of the parking lot at the time of the shooting and people began to scatter and distance themselves from the back of the parking lot when the shooting started. The people who attempted to distance themselves from the back of the parking lot when the shooting started included those patrons heading toward the back of the parking lot and those in the back of the parking lot capable of doing so, including Steven and Dylan. However, there is one conspicuous exception to this—Carter. Carter was the only person in the back of the parking lot who was not struck by bullets or providing aid to those individuals who did not run from the scene of the shooting when it started. He can be seen on the video still standing at the location of the shooting after everyone else capable of doing so had fled that location. The jury could have used this evidence to conclude the reason Carter was not fleeing in fear of the gunshots was because he was the one doing the shooting.

### 4. Evidence Others Were Not the Shooter

A process of elimination is also circumstantial evidence Carter was the shooter. As previously explained, the evidence established the only potential people who could have been the shooter were Dylan, Steven, and Carter. Although several witnesses identified Carter as the shooter directly or by description, not one witness—including Carter—identified Dylan or Steven as having been the shooter or having a gun at the scene. In fact, several witnesses expressly testified seeing Dylan and Steven when the shooting was taking place

and stated neither was the shooter. Under these circumstances, the evidence neither Dylan nor Steven was the shooter is circumstantial evidence Carter was.

### 5. Efforts to Create False Evidence & Changing Defenses

Recordings of Carter's jail calls provide additional evidence of his guilt. One of these was a conversation between Carter and his mother the day after the shooting. Despite the fact that he was in the back of the parking lot at the time of the shooting, Carter told his mother to have his cousin Terry (who was at the bar that night) round up everyone they knew who was at the bar to say he was on the "smoke pad" when the shooting took place. The jury could infer Carter sought to generate witnesses to provide false testimony of his whereabouts because he was the shooter. *See State v. Stufflebeam*, 260 N.W.2d 409, 412 (Iowa 1977) ("An attempt by a party to improperly, even illegally, influence a witness is thought to be an admission by conduct.").

In a recorded conversation two days after the shooting, Carter expressed confidence there was no video of him in the parking lot, stating, "I knew they had cameras and stuff. But, I don't think they had none in that parking lot, so, I know they probably seen me up by the club though." In another recorded conversation that same day, Carter expressed belief that police were trying to trick him by claiming they knew more than they did, but stated, "That ain't going to work, because I don't even know, but I do know I ain't on that video so that's why I know there ain't no video." These conversations show Carter believed there was no video to rebut his false claim he was on the smoke deck while he continued to try to get witnesses lined up to provide false testimony supporting his story.

Carter's tune changed a few months later, after depositions were taken in his case in March 2017 and he learned, for the first time, video evidence established he was at the shooting scene and not on the smoke deck. At that point, during a phone call while in jail, Carter laments the fact there was video coverage of the parking lot, stating, "I didn't even know there was cameras there and shit, but I just seen some of the pictures and shit earlier and shit . . . . But, they got that all on camera and shit, you know what I'm sayin'." At that point, knowing his alibi regarding the smoke deck had been rebutted, Carter's strategy changed. In another phone call recorded later that day, after Carter learned an investigator had visited the house and wanted to speak with his cousin Terry, Carter told his mother to tell Terry to "let [the investigator] know Dylan did it." This direction is troublesome for Carter because, according to his trial testimony, he did not see the shooter and did not know who fired the shots. The jury could infer Carter was trying to get Terry to blame Dylan, albeit without any basis, to escape being identified as the shooter after discovering his claim of being on the smoke deck was not defensible.

## D. Our Role on Sufficiency-of-the Evidence Review

Carter makes arguments attacking the credibility of witnesses, pointing out claimed shortcomings in the investigation, pointing to the failure to link Carter to the later-discovered handgun used in the shooting that was abandoned at a business a few blocks from the shooting scene, noting suspicious behavior by Dylan, and noting Carter's lack of panic while remaining at the bar following the shooting. These are all valid points that could have been, should have been, and were presented to the jury. To be sure, the jury could have concluded the points

noted left them with a reasonable doubt as to Carter's guilt. However, the jury was not obligated to view the evidence in the manner urged by Carter. "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010) (quoting *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004)). Carter would have us resolve conflicts in the evidence and pass upon the credibility of witnesses. But, that is not our role. In considering a challenge to the sufficiency of the evidence, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *Musser*, 721 N.W.2d at 761 (quoting *Williams*, 695 N.W.2d at 28).

### E.      Conclusions Regarding Sufficiency of the Evidence

As detailed above, there is substantial direct evidence that Carter was the shooter. In addition to the direct evidence, there are also numerous pieces of circumstantial evidence pointing to Carter as the shooter, especially when those pieces of circumstantial evidence are considered collectively. *See Ernst*, 954 N.W.2d at 59–60 (noting juries must necessarily make inferences when finding facts based on circumstantial evidence and there is no categorical prohibition on "stacking inferences" so long as the evidence is sufficient to "convince a rational fact finder the defendant is guilty beyond a reasonable doubt" (quoting *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018))). Finding substantial evidence

supporting the jury's verdict that Carter was the shooter, Carter's sufficiency-of-the-evidence challenge fails.

**III.    New Trial Motion – Weight of the Evidence**

Next, Carter claims error in the district court's ruling denying his motion for new trial based on his claim the verdict is contrary to the weight of the evidence. "Iowa Rule of Criminal Procedure 2.24(2)(b)(6) permits a district court to grant a motion for new trial when a verdict is contrary to the weight of the evidence." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Id.* (citation omitted). The analysis is broader than the sufficiency-of-the-evidence analysis "in that it involves questions of credibility and refers to a determination that more credible evidence supports one side than the other." *State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006). Yet it is "also more stringent than the sufficiency of the evidence standard in that it allows the court to grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered." *Ary*, 877 N.W.2d at 706. "[A] district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.*

Review of rulings on new trial motions based on the claim the verdict is contrary to the weight of the evidence are generally reviewed for an abuse of discretion. *Ernst*, 954 N.W.2d at 60. On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of

the underlying question of whether the verdict is against the weight of the evidence." *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003).

In this case, the district court determined the evidence did not preponderate heavily against the verdict and denied Carter's motion for new trial, making the following observations as part of its ruling:

> So to the extent that this is an extremely close case and to the extent that witnesses are drunk and emotionally tied to the victims, there is one area of evidence which is indisputable, and that is the difference between Mr. Carter's claims to the police and what the surveillance cameras show. He simply was not truthful to the police.
> Now, whether that dishonesty as indicia of guilt is outweighed by no motive, no connection to the gun, no physical evidence on him is not the decision for the Court to make. It is a decision for the jury to make. And that evidence is certainly sufficient to support a verdict such as they rendered. And the gravitas, the weight of that evidence, I believe, is sufficient to support the verdict.
> The danger that this case presents to the process of finding the truth is that it is replete with unmitigated dishonesty, witnesses who would not be truthful with police, witnesses who could not tell the same story more than once without changing it, and when we are faced with this grand collection of questionable testimony, there is only one group of people we can rely on to sort it out, and that is the jury, and that is why we have them.

Based on the district court's findings and analysis, we find no abuse of the district court's discretion in denying Carter's motion for new trial.

## IV.    Ineffective-Assistance-of-Counsel Claims

For his final challenge, Carter claims his trial counsel was ineffective for failing to pursue forensic testing of his clothes, introduce Tytrace's cell phone video taken shortly after the shooting that included a close-up view of Carter showing his demeanor and clothing, question the State's witnesses on the angle of bullet

wounds, and request a spoliation instruction based on the State's failure to obtain and preserve Dylan's clothing and the contents of his cell phone.

The right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. *State v. Ambrose*, 861 N.W.2d 550, 556 (Iowa 2015). To succeed on his claim of ineffective of counsel, Carter must establish (1) his counsel failed to perform an essential duty and (2) such failure resulted in prejudice. *See State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015).

When seeking to have ineffective-assistance-of-counsel claims resolved on direct appeal, the defendant must establish there is an adequate record to allow our court to address the claims.[16] *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010). It is for us to determine whether the record is adequate to address the claims on direct appeal and, if so, to resolve them. *Id.* However, if we determine the record is inadequate to address the claims on appeal, the claims are preserved for postconviction-relief proceedings. *Id.* In this case, we find the record inadequate to address Carter's claims on direct appeal, as the issues raised may have been strategic decisions made by defense counsel and counsel should be

---

[16] The State asserts we cannot address Carter's ineffective-assistance-of-counsel claims on direct appeal due to legislative changes to Iowa Code section 814.7, which address a defendant's ability to raise such claims. Section 814.7 was amended in 2019 to provide in pertinent part: "An ineffective assistance of counsel claim in a criminal case shall be determined by filing an application for postconviction relief" and "shall not be decided on direct appeal from the criminal proceedings." *See* 2019 Iowa Acts ch. 140, § 31 (codified at Iowa Code § 814.7 (Supp. 2019)). In *State v. Macke*, however, our supreme court held these amendments "apply only prospectively and do not apply to cases pending on July 1, 2019." 933 N.W.2d 226, 235 (Iowa 2019). Carter's appeal was pending on July 1, 2019, so we conclude the amendments "do not apply." *See id.*

given the opportunity to explain them. *See State v. Bentley*, 757 N.W.2d 257, 264 (Iowa 2008) ("Even a lawyer is entitled to [the lawyer's] day in court, especially when [the lawyer's] professional reputation is impugned." (quoting *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978))). Therefore, we decline to address Carter's ineffective-assistance-of-counsel claims in this forum.

## V. Conclusion

Finding sufficient evidence to support the jury's verdict determining Carter was the shooter, no abuse of discretion in the district court's denial of Carter's motion for new trial, and an inadequate record to address Carter's claims of ineffective assistance of counsel on this direct appeal, we affirm Carter's convictions.

**AFFIRMED.**

Mullins, J., concurs; Vaitheswaran, P.J., dissents.

**VAITHESWARAN, Presiding Judge.** (dissenting).

I respectfully dissent. In my view, the record contains insufficient evidence to support the jury's findings of guilt.

I begin with the obvious: the burden of proof was not on Carter but on the State. The State was required to prove every element of the charged crimes beyond a reasonable doubt. The jury was instructed "[p]roof beyond a reasonable doubt . . . must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it."

What is our role? The question is not whether we would hesitate to act. Nor are we asked to decide whether Carter is innocent of the crimes. *See State v. Rush-Brantley*, No. 12-1915, 2015 WL 161791, at *6 (Iowa Ct. App. Jan. 14, 2015) ("We cannot say affirmatively that [the defendant] is innocent."). The only question is whether substantial evidence supports the jury's findings of guilt. *See State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021). The substantial-evidence standard "means a person may not be convicted based upon mere suspicion or conjecture." *Id.* (citation omitted). We are obligated to "consider all the evidence in the record, not just the evidence supporting guilt." *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). The test is not a rubber stamp. *See State v. Waigand*, 953 N.W.2d 689, 695 (Iowa 2021) (on substantial-evidence review, stating "[s]entencing courts should not rubber-stamp victim restitution claims" (quoting *State v. Roache*, 920 N.W.2d 93, 108 (Iowa 2018))). As the court of appeals stated:

> The mere fact that a jury did find [the defendant] guilty . . . does not answer the legal question as to whether the evidence was sufficient to have ever been presented to the jury. If we allow ourselves to be influenced—or our analysis to be dictated—by a jury's guilty verdict, then no denial of a motion for judgment of acquittal could ever be

successful, and no sufficiency-of-the-evidence . . . challenge could ever be successful. While our case law reveals that such motions are not often successful, we must evaluate each motion for judgment of acquittal on its own merits as though the case had not been submitted to a jury.

*Rush-Brantley*, 2015 WL 161791, at *6.

The jury was instructed first-degree murder required proof of the following elements:

> 1. On or about August 6, 2016, the defendant shot [Bill].
> 2. [Bill] died as a result of being shot.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill [Bill].

The jury was further instructed that the State would have to prove the following elements of attempt to commit murder:

> 1. On or about August 6, 2016, the defendant shot [Bub and Carley].
> 2. By his acts, the defendant expected to set in motion a force or chain of events which would cause or result in the death of [Bub and Carley]
> 3. When the defendant acted, he specifically intended to cause the death of [Bub and Carley].

And the jury was instructed that the State would have to prove the following elements of intimidation with a dangerous weapon with intent.

> 1. On or about the 6th day of August, 2016, the defendant shot or discharged a firearm at or into an assembly of people.
> 2. The defendant did so with the specific intent to cause serious injury or provoke fear of serious injury.
> 3. The firearm was a dangerous weapon, as explained in another instruction.
> 4. The assembly of people actually experienced fear of serious injury and the fear was reasonable under the existing circumstances.

The jury also was instructed: "The State is required to prove more than a mere nearness to, or presence at, the scene of the crime and more than mere knowledge of the crime."

Carter asserted he was not the person who shot or discharged a weapon. His focus on identity implicates all the elements of each crime. For example, if he did not shoot Bill—the first element of first-degree murder—he could not have acted with malice aforethought or willfully, deliberately, and with premeditation. In other words, the State could not prevail without proof of identity beyond a reasonable doubt.

### A.     An Alternate Suspect

At trial, Carter posited that the crimes were committed by someone else. On appeal, the State asserts, "Carter's alternate suspect theory conflicts with other evidence." To the contrary, the record is replete with evidence supporting Carter's theory. As the district court stated in ruling on Carter's motion for judgment of acquittal, "There is no evidence that the escalation of violence in this case was precipitated by [Carter]. It was precipitated by another person."

The person who indisputably instigated the altercation that culminated in a shooting was not Carter but Dylan. All the people in Dylan's group who lived to testify confirmed as much.

Bub testified he went to several Des Moines bars with Bill and a number of other people, including his "close friend[]" Dylan. At the last establishment, Dylan gave Bill's girlfriend money to buy a pitcher of beer. When she did not return with the pitcher, Dylan began an argument with Bill in the parking lot. Bill in turn was "waving his arm, telling him to get away." Bub told Dylan to "just relax and leave

[Bill] alone." He tried to "[c]alm Dylan down." Bub further testified that the situation "escalated" after Dylan enlisted Steven's help and returned to the parking lot.

Bub's girlfriend, Carley, similarly testified she saw Bill and Dylan "walking to the parking lot," and Bill "was kind of trying to avoid the situation," but Dylan "just kept going at him." She said Dylan "was kind of . . . grabbing" Bill and Bill was "trying to . . . calm [him] down . . . kind of trying to get him to stop."

In the same vein, another member of the group–Ashley–testified Dylan and Bill "were just arguing" and Bill "kept telling him to stop, get out of his face, he didn't want to have to hurt him," but Dylan "just kept going and going." After the shooting, she ran over to Dylan and "told him that it [was] his fault that this happened . . . basically he killed [Bill], because if he would have left him alone, it wouldn't have happened."

Even Dylan's girlfriend, Bonnie, confirmed that she "saw Dylan following" Bill and Bill "told him to get away from him." She said, "It just got heated, because Dylan wouldn't leave the situation alone."

After confronting Bill, Dylan returned to the bar area, where his relative Steven was smoking. According to Steven, his "little cousin, Dylan," walked up and said "he was about to get jumped by a couple black guys." Others who overheard the conversation testified that Dylan referred to "three black guys." Whatever the number, Dylan was alone in his assertion that he was assaulted, alone in his identification of the perpetrators, and alone in his identification of the race of the claimed perpetrators. No one in Dylan's group stated or implied that anyone assaulted Dylan or that any "black guys" were involved in the pre-shooting altercation in the parking lot. Nor did video evidence corroborate Dylan's rendition.

It is worth noting that Carter—who was identified as an "African-American individual"—was not in the parking lot at the time. Although the jury was not charged with deciding whether Dylan committed the crimes, his blatantly false statements support rather than undermine Carter's alternate-suspect theory. As the district court stated:

> There is simply no physical evidence that links this defendant to a firearm that night. None. There is no motive. Now, the State does not have to prove motive. The law is clear about that. But what's the motive? What is the motive for this defendant to shoot someone? The person with the motive in this case was Dylan . . . . He started the fight. He was angry. He refused to disengage from the argument with the decedent. The decedent sought to get away from him, and he pursued him. He was in close proximity to the parties who were shot. And there was clear evidence in this record he was armed that night. There is not clear evidence that this defendant was armed that night.[17]

Notably, Dylan acknowledged he "was ready to fight" and he "was very angry." He admitted that when he drank and got drunk he became belligerent and somewhat reckless. And, as the district court stated, there was "clear" evidence Dylan had a gun. That evidence came from three witnesses who had no axe to grind with Dylan or Carter or a motive to protect either.

Brandi was "very good friends" with Bill's family and knew Dylan. She was at the bar on the night of the shooting. She testified Dylan was "upset" and "stormed out" of the bar, and Bill "went after him." At that point, Brandi left to go to another nearby bar. She heard someone say, "Call 9-1-1," and she went outside. She and her friends, Chad and his girlfriend, decided to leave. Brandi retrieved

---

[17] The court ultimately denied Carter's motion for judgment of acquittal but not for lack of evidence that Dylan had a motive to fire the shots.

her car and followed Chad down an alley.  In time, she saw a "Caucasian" "male" "crouched down behind [the] fence" adjacent to a vacant house.  The man "only had on a pair of shorts . . . and shoes" and "[n]o shirt."  The shorts were "cargo shorts."  The person got up and went toward Chad's truck.  Brandi's headlights illuminated the truck, and she recognized the person as Dylan.  Dylan tried to get into the truck but momentarily appeared "shocked, and then . . . started to run," coming back "right past [her] driver's side window."  Brandi saw "something in his waistband," which she believed to be "[a] gun."  Chad chased after Dylan, returned less than a minute later, and told Brandi, "I think that was the shooter.  He had a gun."  Brandi believed Dylan also had a cell phone in his hand but she stressed that the item in his hand was "[d]ifferent" from the item in his waistband.

Two or three days after the shooting, Brandi saw Carter's picture on television.  She called the police department and gave a detective her contact information.  She was interviewed by the police "a few months" before trial, and she told the detective overseeing the case that she "saw a gun in [Dylan's] waistband" and she was confident it was a gun.  She did not know Carter and had never spoken to him.

Chad's girlfriend was at the neighboring bar with Brandi.  She heard gunshots and recommended leaving.  After dropping Brandi off at her car, she drove Chad's truck down the alley.  She confirmed that a young man with shorts and no shirt tried to get into the passenger side of the truck.  She testified, "[O]n his waistband, it looked like . . . a gun."  When the man started running, Chad chased after him and, on returning, told her the man "did have a gun, and [Chad] thought maybe it could have been the shooter."  She did not know Dylan or Carter.

Chad confirmed the substance of the women's testimony. He was a passenger in the truck driven by his girlfriend. He watched as a "kid" came running down the alley and tried to jump into his vehicle.[18] The kid did not have a shirt on, his shorts were saggy, and "he was trying to hold a weapon or trying to hold his shorts up, but he was holding something." Although Chad acknowledged the "kid" could have been holding his cell phone, he was aware of the shooting and suspected the young man could be the shooter.

In addition to Dylan's motive to kill and the eyewitness sightings of Dylan with a gun, there was other evidence supporting Carter's alternate-suspect theory.

Dylan admitted he had on a white t-shirt when he was at the bar. He also admitted that after the shooting, the shirt had blood on it. And he admitted he removed and discarded the shirt as he was running away from the crime scene. Dylan's bloody shirt was never recovered. In contrast, Carter, who was also wearing a white t-shirt, did not discard his shirt; no victims' blood was found on it; and no bloody clothing was found in his house.

As noted, Dylan was wearing baggy cargo shorts. Carter was also wearing baggy shorts made of blue jeans material, consistent with his statement to police that he was wearing jeans.[19] No victims' blood was found on Carter's shorts.

---

[18] What Chad did not know was that, according to Dylan, his aunt had arranged for one of her friends to pick Dylan up and Dylan believed Chad was the person waiting for him. On realizing he was not, Dylan jumped out of Chad's truck, ran, and was picked up by the aunt's friend.

[19] The State also asserts, "Carter lied about wearing jeans." But Carter was not the only person who described his shorts as "jeans." Dylan's girlfriend did as well.

Dylan had a cell phone, yet he told the detective overseeing the case that he did not. The fact that he denied having a cell phone in the face of overwhelming evidence to the contrary suggests he had something to hide. It was later clarified that he left the phone at his aunt's house. Unlike Carter's phone, Dylan's was never retrieved and his calls, contacts, and text messages that might have shed light on his role on the night of the shooting were never extracted. *See State v. Schuldt*, No. 19-0277, 2019 WL 5792681, at *4 (Iowa Ct. App. Nov. 6, 2019) (noting "cell phone location markers could reveal where [the defendant] was located during the time he went unaccounted for"); *State v. Chandler*, No. 16-1608, 2017 WL 5185431, at *1–2 (Iowa Ct. App. Nov. 8, 2017) (noting the defendant denied lending his cell phone to anyone despite evidence that it was used at the scene of the crime); *Wright v. State*, No. 15-1530, 2017 WL 936077, at *7 (Iowa Ct. App. Mar. 8, 2017) (noting defendant's "cell phone was receiving signals at the murder scene").

Dylan also fled the scene. In his own words, he "ran." In contrast, Carter remained at the scene, a fact that detracts from a finding of guilt. In fact, Steven's mother saw Carter before and after the shooting. Carter also voluntarily spoke to police the following morning, whereas Dylan was more reluctant to do so.

The State argues Dylan's flight does not support Carter's alternate-suspect theory because Dylan "provided a rational, non-incriminating explanation for his flight from the scene." Dylan admitted he "ran" because he was "scared." But scared or not, our precedent provides that flight may constitute substantial evidence of guilt. *See State v. Wilson*, 878 N.W.2d 203, 211, 214–15 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has

been committed may constitute circumstantial evidence of consciousness of guilt";
"[t]he inference that flight was motivated by the defendant's desire to avoid
prosecution for the crime charged is strongest when the defendant flees in its
immediate aftermath or shortly after being accused thereof"; "[t]he bottom line is
that for evidence of flight to have probative value, the critical question is not
whether the state had formally accused the defendant of the charged crime, but
whether the evidence permits a reasonable inference the defendant acted out of
fear of apprehension for the charged crime."); *see also State v. Gibbs*, 941 N.W.2d
888, 912 (Iowa 2020) (McDonald, J., specially concurring) ("[O]ur cases hold
evidence of a defendant's failure to remain at the scene of a crime and a
defendant's postoffense attempt to evade law enforcement is admissible and
probative of guilt."); *State v. Magee*, No. 03-0344, 2004 WL 433795, at *4 (Iowa
Ct. App. Mar. 10, 2004) (stating the defendant's "attempted flight and efforts to
escape apprehension support an inference of guilt"). As the district court stated,
the person who "precipitated" the escalation in violence "fled the scene; [Carter]
did not."

In sum, Dylan fought with the person who was ultimately shot to death;
falsely claimed he was assaulted; falsely claimed the assault was committed by
"black guys"; discarded his white, bloody t-shirt; denied having a cell phone,
leading to an inference that the phone contained inculpatory evidence; fled the
crime scene; and was seen with a gun. While no one is faced with deciding
whether Dylan was the shooter, I would conclude this "alternate-suspect" evidence
in Carter's trial record raises reasonable doubt about Carter's guilt. In other words,
a rational trier of fact would not be convinced of Carter's guilt beyond a reasonable

doubt. *See Ernst*, 954 N.W.2d at 54 ("Substantial evidence exists when the evidence would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." (internal quotation marks and citations omitted)).

### B.      Surveillance Videos

The State asserts surveillance videos connected Carter to the shooting. The video of the back parking lot arguably should serve as highly probative evidence of the shooting. It does not. The video lacks audio and, as several witnesses noted, the darkness and poor lighting limit its evidentiary value. The video does capture Carter walking toward the back of the lot with Dylan and Steven. But the jury was instructed mere presence at the scene of a crime is insufficient to support a finding of guilt. And, contrary to the State's assertion, the video does not capture the shooting or anyone with a gun. At best, it shows a momentary puff of smoke. It is impossible to see who or what generated the smoke. A criminalist with the department of criminal investigation said as much, agreeing with the defense that the smoke "could or could not . . . be smoke from a gun." To discern the shooter's identity from the videos would, in my view, amount to pure speculation. *See State v. Martinez*, 17-1373, 2018 WL 3060270, at *3 (Iowa Ct. App. June 20, 2018) (concluding "officers' after-the-fact observations from the short video clips do not constitute proof beyond a reasonable doubt that [the defendant] was one of the burglars").

### C.      Eyewitness Testimony – Steven

The State asserts that "[m]ultiple eyewitnesses identified Carter as the shooter." In fact, of the more than four dozen witnesses called by the State, only one directly identified Carter as the shooter—Steven. As noted, Steven was a

relative of Dylan. He had every incentive to place the gun in the hands of someone other than his "little cousin." But even if it was uniquely the jury's role to consider the familial relationship in assessing his credibility, other facets of his testimony render him an objectively unreliable eyewitness. *See State v. Shorter*, 893 N.W.2d 65, 81 (Iowa 2017) (noting "[t]he reliability of eyewitness testimony has been the subject of intense commentary . . . [y]et, juries often attach great weight to eyewitness identification without consideration of reliability").

Steven provided several versions of events. The morning after the shooting, he gave a statement to police in which he told two detectives that he saw Carter "pull the gun out, and he shot one in the air." At the same time, he did not identify Carter as the shooter of the three persons; he simply identified Carter as a person with a gun—a distinction that is important given the evidence that Dylan had a gun.

Steven acknowledged he was "drunk as shit" at the time of the shooting and was still feeling the effects of alcohol at the time of the interview. In fact, Steven had consumed around fifteen drinks at the bar, with his drink of choice being eighty-proof whiskey mixed with an energy drink. He had also consumed five or six drinks before arriving at the bar and was feeling the effects of that alcohol. He was so drunk that he did not remember crossing the street with Carter from the bar to the parking lot.

Steven also told the detectives he left the scene in a car with a man named Rick when he in fact left in a different car with two people named Chris and Christina. It is worth noting that, as he came up to Chris and Christina's car, he told them shots were fired, but he did not say he saw the shooter or identify the

shooter. Nor did he disclose those key facts during the ride or after everyone got out of the car.

Steven additionally informed the detectives he got a ride "to [his] house" when he in fact went to his mother's house first. This memory lapse takes on added significance because the stop was not momentary; all the people got out of the car at his mother's house and Steven waited there for his mother to arrive.

If all this were not enough to call the reliability of Steven's police statements into question, Steven's statements about where Carter was relative to him should raise reasonable doubt. Steven told the detectives that Carter walked along a chain-link fence and around the backside of the cars. Video surveillance showed Carter directly behind him.

Steven's alcohol-impaired mental state and his misidentification of key facts lead me to conclude that his police statements amounted to conjecture. *See State v. Barnes*, 204 N.W.2d 827, 829 (Iowa 1972) ("Suspicion is no substitute for proof."); *State v. Khouanmany*, No. 12-1428, 2013 WL 5760951, at *4 (Iowa Ct. App. Oct. 23, 2013) (reversing a conviction "based on mere speculation"); *see also State v. Booth-Harris*, 942 N.W.2d 562, 587 (Iowa 2020) (Appel, J., dissenting) ("An eyewitness's ability to perceive and remember may be impacted by characteristics and conditions of the witness themselves. Personal characteristics include intoxication, injury, illness, age, and fatigue."); *State v. Doolin*, 942 N.W.2d 500, 520 (Iowa 2020) (Appel, J., dissenting) ("There are literally dozens and dozens of studies that consistently show a high rate of error in eyewitness identifications even under favorable conditions.").

Several months after the police interview, Steven retracted his police identification of Carter. In the first of two depositions, he was asked whether he saw "a shooter." He responded, "No, I didn't. I didn't, because it was dark behind the trees." He was then asked, "Did you see anyone with a gun?" He responded, "No." The defense pressed, "Did you see anyone with a gun that night?" Steven again answered, "No." He admitted seeing a muzzle flash but stated he could not see the person firing the gun. When asked if he saw Carter again after the time he saw him in the bar that night, he responded, "No." Steven's retraction of his initial identification, juxtaposed with the numerous factors rendering that police identification unreliable, again lead me to conclude that the police identification did not amount to proof beyond a reasonable doubt.

Steven was deposed a second time shortly before trial. At this deposition, Steven retracted his retraction and reprised the version of events he gave to police. He stated he saw Carter walk around a car to get behind the people, heard the first shot, and ran the other way. He admitted the identification was made as he was running and looking over his shoulder, with a car between himself and Carter. Would his alcohol-fueled, over-the-shoulder identification of a man he could not initially locate convince a rational trier of fact of Carter's guilt beyond a reasonable doubt? I think not.

Steven's trial testimony largely matched the statements in his second deposition. He stated he looked in the direction of the shots and "seen [Carter] with a gun in his hand." The gun "was just in the air swirling, and then [he] took off running after the second gunshot." Again, he acknowledged going to a party and consuming beer and whiskey before arriving at the bar and he could not recall

when he left the party because he "was a little intoxicated." In his words, he had been drinking "[a] lot."

After the defense skewered Steven with his questionable acuity, the State attempted to bolster his testimony with statements from his second deposition. I am not convinced the deposition satisfied the requirements of Iowa Rule of Evidence 5.801(d)(1)(B) for admission as substantive, non-hearsay evidence. That rule deems the testimony "not hearsay" only if a party offers the prior statement "to rebut an express or implied charge that the declarant recently fabricated" his or her trial testimony "or acted from a recent improper influence or motive in so testifying." To qualify as substantive non-hearsay evidence, the statement must have been made before the improper motive arose. *State v. Johnson*, 539 N.W.2d 160, 165 (Iowa 1995).

The defense claimed the State threatened Steven with perjury and the threat was especially coercive because Steven was a felon who did not want to go down the prison road again.[20] The defense elicited testimony from Steven that between his first and second deposition, he had a conversation in which perjury charges were mentioned. It was only after the conversation that Steven changed his story and stated Carter had a gun. Because Steven's revised version of events came after the threat of perjury, not before, the testimony contained in Steven's second deposition was, in my view, hearsay and inadmissible as substantive evidence.

---

[20] The jury was instructed, "A witness has admitted having been convicted of or having pleaded guilty to a felony. You may use that evidence only to help you decide whether to believe the witness and how much weight to give their testimony."

In sum, Steven's trial identification was fraught with ambiguity. He did not say Carter shot Bill, Bub, and Carley. He said Carter's gun "was just in the air swirling." To say the least, his perceptions were compromised.

Other witnesses contradicted Steven's testimony. His own sister, Cody, who knew Carter and said she had "always had a good vibe with him," denied seeing anything about Carter that would make her believe he was carrying a gun. Steven's mother, who was close enough to Carter that he could put his arm around her, similarly denied seeing anything that would have led her to believe Carter was armed with a gun. *See State v. Warth*, No. 98-1895, 2000 WL 62973, at *2 (Iowa Ct. App. Jan. 26, 2000) (concluding "the evidence [was] insufficient to sustain a conviction for carrying a concealed weapon").

Several people in the midst of the fray did not identify Carter as the shooter. Bub failed to identify him and admitted he answered, "No" when asked at a deposition whether Carter was the person who fired the shots. He also conceded telling a detective that he did not see the person who wielded the gun. Carley did not see a shooter or see where the shots came from.[21] Dylan, who alleged he "blacked out" after the shots rang out, testified he did not know who fired the shots and did not see the person who said, "You know I've got your back, Pookie." At the same time, he managed to exculpate himself and his close friends and family. Dylan's girlfriend, Bonnie, cited by the State as another key eyewitness, did not

---

[21] Carley was shot but lived to testify because of the heroism of a Des Moines patrol officer who arrived at the scene shortly after the shooting. He saw Carley lying in a pool of blood with a bullet hole in one of her legs and he surmised her femoral artery had been hit and she would "have three minutes to live." The officer immediately applied a tourniquet to stanch the bleeding.

see who fired the shots. And Ashley testified she did not see a gun or a person holding a gun.

The State points to evidence that "Carter possessed a holster that fit the murder weapon." But a criminalist with the department of criminal investigation testified that a holster found beneath "clutter" in the back cargo area of Carter's vehicle was "kind of a generic ballistic nylon holster made for a number of semiautomatic . . . medium-to large-size pistols." He demonstrated that a model other than the one used in the crimes could fit into the holster.

Another witness, Brandon, testified he was arrested for possessing the gun that was in the holster. He stated he rode in Carter's vehicle sometime before the shooting, the vehicle was "pulled over for improper lane use," and he stuffed the gun in the backseat and separately hid the holster. An officer seized the gun but left the holster in the vehicle. Brandon was later prosecuted for illegal possession of a firearm. At Carter's trial, he was shown the holster taken from Carter's vehicle following the shooting. He testified, "That's my holster." In short, he gutted the State's attempt to tie Carter to a gun through the holster in his car. *See State v. Serrato*, No. 08-0799, 2009 WL 2185819, at *4 (Iowa Ct. App. July 22, 2009) ("[T]he State's theory . . . was only that—a theory. No rational jury could conclude that this theory was proved beyond a reasonable doubt.").

I am left with an objectively unreliable identification unsupported by Steven's closest relatives or any of the other individuals in the back part of the parking lot and undercut by a prior recantation together with the wholesale discrediting of the State's holster evidence. The district court said it best: "There is only one person in this record who has placed the firearm in the possession of this defendant. That

witness was intoxicated. That witness was impeached. That witness was a close associate of the man who ran from the scene." Although the court allowed the case to go to the jury, the court articulated similar concerns after trial:

> The defendant was never connected to the gun. No one saw it on his person. No one found ammunition for it on his person or anywhere under his control. The police never did any physical examination of him to determine if there was any gunpowder residue, antimony, or barium, powder burns, blood of the victims, blowback. There is simply no physical evidence that links this defendant to the firearm that night. None.

While individuals may be found guilty without physical evidence,[22] Steven's eyewitness testimony, in my view, did not establish beyond a reasonable doubt that Carter possessed a gun, let alone that he used it to shoot Bill, Bub, and Carley.

### D. Putative Eyewitness – Tytrace

The second claimed eyewitness named by the State was Tytrace. In fact, he did not identify Carter as the shooter at trial. He testified he was at the scene, lay down when he heard shots, then tried to grab his sister who, in another act of heroism, was cradling one of the people who was shot, apparently without regard to her own safety. Tytrace tried to leave, but police arrived and arrested him. They took his cell phone and escorted him downtown. Tytrace did not recall identifying the shooter from a video shown to him by police. He testified he "never seen Carter."[23]

---

[22] A gun was found and shell casings were found, but, as discussed, they were not tied to Carter.

[23] Under the guise of refreshing Tytrace's recollection, the State read quotations from the sergeant's interview transcript into the record. The supreme court recently criticized this practice. *See State v. Swift*, 955 N.W.2d 876, 882–83 (Iowa 2021) ("The State attempted to refresh her recollection seemingly by reciting statements from a police report. . . . [T]hat practice should be limited. . . . The State thus wasn't permitted to read, seemingly verbatim, [the witness'] out-of-court

The State was allowed to counter Tytrace's non-identification testimony with testimony from the sergeant who interrogated him following his arrest.[24] The sergeant stated Tytrace "showed [him a] video from his phone" and identified the shooter. He testified the person Tytrace identified was Carter. The cell phone video, which was the backbone of the sergeant's testimony, was excluded from the record. The district court's rulings on the admissibility of the video underscore the tenuousness of the sergeant's effort to tie Carter to the crimes.

The State did not seek to admit the cell phone video through Tytrace. Instead, the State first offered it through Steven's mother. She had no inkling who

statements from the police report under the guise of refreshing her recollection."). Although the State did not have the benefit of *Swift*, I believe the questioning ran afoul of *Gilmore*. *See id.* at 883 ("While the State is 'free to try to make her admit she remembered the underlying facts bearing on the issue,' it is 'not free to read into evidence the prior statement.'" (quoting *State v. Gilmore*, 259 N.W.2d 846, 857 (Iowa 1977))). The defense's objection on a slightly different ground was overruled and the ruling is not challenged on appeal.

[24] In *State v. Russell*, 893 N.W.2d 307, 318 (Iowa 2017), which authorized the admission of second-hand identification evidence such as the sergeant's, the prior inconsistent identification was admitted because the person against whom it was offered "established the foundation for admission of the evidence when she admitted that she provided the prior statement and admitted that she identified [the defendant], even though she testified that she had no current memory." The court stated a prior inconsistent statement was inadmissible "when the witness did not remember the underlying facts that were the subject of the prior statement." *Russell*, 893 N.W.2d at 317 (citing *Gilmore*, 259 N.W.2d at 857). Tytrace did not recall the prior statement to police. He was asked whether he recalled reviewing the video with the sergeant. He responded, "No, sir." He was asked whether he recalled making an identification on a video. He responded, "No, sir." He was asked about the specific statements the sergeant attributed to him, all prefaced by "do you recall." Each time, Tytrace responded, "No, sir." He variously stated, "I don't remember ever saying that"; "I don't recollect that, like I told you"; "I don't recollect giving a statement, like I told you"; and "None of this I don't remember." I am not convinced the sergeant's identification testimony was admissible to counter Tytrace's failure-to-recollect statements. However, that is water under the bridge, given the defense's concession that *Russell* allowed for identification testimony from the sergeant and the absence of an appellate challenge to the admissibility of the sergeant's testimony.

took the video or precisely when. The defense objected on several grounds, including lack of foundation. In excluding the video, the court stated, "[W]hat [the cell phone video] does is establish mere presence. It doesn't establish identity of a person who's committed a crime. . . . It does no more . . . than establish one more person among the many that were running around at the time of the shooting." Because Carter was identified as being at the scene through another video, the court concluded the cell phone video was "cumulative."

The State offered the cell phone video a second time, through Steven. The prosecutor asked Steven if, during his police interview, he identified Carter as the shooter from the cell phone footage. Steven said, "No." The court again excluded the footage, reasoning in part that "the prejudicial effect . . . outweigh[ed]" any relevance it might have.

I believe the sergeant's once-removed identification of Carter as the shooter, drawn from the unadmitted, marginally relevant, and unfairly prejudicial cell phone video, would not convince a rational fact finder of Carter's guilt beyond a reasonable doubt.[25]

### E.    Carter's Testimony

The State points to Carter's trial testimony as evidence supporting a finding that he was the shooter. The State asserts he "repeatedly lied to investigators about material facts." No question he did. But Dylan lied. And Steven lied. I

---

[25] On appeal, Carter asserts his trial attorneys were ineffective in objecting to the video evidence because it in fact contained "numerous indicators of his innocence," including the absence of any "blood splatter" on his "pristine, white t-shirt." In light of my conclusion that the case should be reversed on insufficiency-of-the-evidence grounds, I would find it unnecessary to address or preserve the issue.

accept that the sorting of these lies was exclusively within the jury's purview. However, even if Carter's hesitation to come clean about his presence in the parking lot gave the jury cause to reject his testimony in its entirety, the jury was left with Steven's objectively unreliable eyewitness testimony as the lynchpin of the State's case. And even if the jury found Steven entirely credible notwithstanding the objective indicia of unreliability, that still leaves the record with a single witness who saw Carter shooting a gun into the air, multiple witnesses who did not see Carter with a gun, a witness who "definitely" saw Dylan with a gun, multiple witnesses who testified to Dylan's intent to harm Bill, and scant if any evidence that Carter acted "willfully, deliberately, premeditatedly and with a specific intent to kill." On this record, I would find no more than Carter's proximity to the scene of the crimes. I believe there is insubstantial evidence to support the jury's findings of guilt, and I would reverse Carter's judgment and sentence. *See State v. Ortiz*, 905 N.W.2d 174, 182–83 (Iowa 2017) (reversing jury's finding of guilt on second-degree robbery charge after concluding "the evidence is insufficient to prove beyond a reasonable doubt that [the defendant] had 'the intent to inflict serious injury'"); *State v. Schlitter*, 881 N.W.2d 380, 391 (Iowa 2016) (reversing a jury finding of guilt after stating the "finding could only be based on speculation" and "[s]peculation and conjecture cannot be used to support a verdict"); *State v. Robinson*, 859 N.W.2d 464, 481 (Iowa 2015) ("In the end, the [sufficiency-of-the-evidence] question calls for an exercise of our judgment as to whether, on the totality of the circumstances, the State offered sufficient evidence that a jury could find beyond a reasonable doubt that the" elements of the crime were satisfied.); *State v. Neiderbach*, 837 N.W.2d 180, 218 (Iowa 2013) (concluding the "State's

evidence . . . fail[ed] to meet the sufficiency threshold"); *State v. Pierce*, No. 13-2004, 2015 WL 3613329, at *4–5 (Iowa Ct. App. June 10, 2015) (finding the "identifying information of the two killers at the murder site is weak" and "[f]inding the evidence [was] insufficient to convince a rational trier of fact of [the defendant's] guilt beyond a reasonable doubt."); *State v. Davolt*, No. 10-0071, 2010 WL 5394989, at *2 (Iowa Ct. App. Dec 22, 2010) ("Although the jury was free to reject the testimony of [a witness] as not credible, . . . there is little other evidence by which to judge [the defendant's] state of mind at the time he took the vehicle.").